case, well first of all I want to, on behalf of Judge Collin and myself, I want to welcome Judge Jean Prater from the United States District Court for the Eastern District of Pennsylvania who's sitting with us this afternoon. It's a pleasure to be here, thank you. And we thank you for serving on this panel. We have, we still have one vacancy on our court and until about a month ago we had two vacancies. Without the service of all of our senior judges and many others that we can ask to help us, we would not be able to stay anywhere near current and so we thank Judge Prater and others. The case on our agenda this afternoon is the case of Carl J. Mayer v. Bill Belichick, a I guess I should state on the record before we start this, I just saw this yesterday, that I'm a seasoned ticket holder, long time, the Pittsburgh Steelers. Now I take it that that status doesn't preclude me from hearing a matter involving seasoned or for Coach Belichick and the NFL to be aware. I at least have some, if not interest, past experience with the issue before this court, but I don't see any conflict unless those of you feel that there is. Assuming we get back to the District Court, Your Honor, we'll gladly make sure you're not a part of the class. Okay, all right. Thank you. Is there any problem with that, counsel? No problem. No problem. Okay, you may proceed. Thank you. Good afternoon. May it please the court. I'm Bruce Safran, I'm arguing initially for the appellate, Mr. Mayer, and on behalf of the putative class. May I just note, Mr. Mayer has reserved seven minutes for rebuttal and his argument will follow the appellees. The principal error we allege with respect to the District Court decision is its misapplication of Schubert and Bauer. Those decisions do not preclude the relief. To the contrary, Schubert actually recognizes a right of the refund of the ticket price. Bauer was an action solely against the venue owner, who the court held could not be responsible for whatever breach the participants in the event undertook. In addition, Bauer very interestingly notes that there could be no wrong because there was no violation of the Formula One league rules in any event. The notion of having six teams versus 13 was within the rules. So Bauer says, first of all, this is an action against the venue holder, which is not our case. And secondly, there was no violation of the league rules in the first place. It's undisputed that the NFO rule was violated here. The Commissioner makes it clear this was a wrongful act by his own comments and by the own internal discipline they impose on the Patriots and Coach Belichick. Yeah, but once I got to do it, didn't the district court rely on rather well-established law that you really bought a seat in a proceeding and you didn't really contract with either of the teams as to the level of or what type of gain you were going to see? One that had fouls in it or whatever? Well, to the extent the district court said that, we submit that the court is in error because there is a fundamental understanding of the contract between the ticket holder and whoever sells the ticket or has a third-party relationship with the ticket holder, such as the Patriots. That understanding is a game played on a neutral and level playing field between two contestants who will come at this game as equals as best they can. No one's buying a ticket to a... If we buy your position then, wouldn't any foul, any intentional wrong, any violation of the rules be an actual lawsuit then? With respect, no, Your Honor, because those are game-day violations that are part of the game. If a player commits a face mask violation, there is a response by the referee on the field and that's part of the game. In fact, the player might intentionally foul for some tactical advantage in the game and that's remedied by a penalty. So game-day violations, on-the-field violations are not the same as a concerted pattern by the management of a team to omit a fundamental violation of the contractual understanding that any ticket holder would have. So what is that understanding? A ticket holder is spending hundreds of dollars for a season ticket, or any individual game ticket rather, to see this match that's played on a neutral playing field. No one would spend this money... But isn't that exactly the point? The ticket allows you to see the match and isn't what you're proposing that each time a referee fails to call a foul, or excuse me for perhaps not using the right terms, that every time the referee or the umpire doesn't call a rule infraction, the ticket holder, instead of booing the ref, is going to file a lawsuit. Can we really have that? Your Honor, that's not what we would have here. How is that different than what you're arguing? Fraud is not the same as the failure of a referee to make a call that someone else thinks he should have made. Here we have actions that precede the game. We have a conspiracy by the Patriots to steal illicitly signals of the other team, thereby undermining and subverting the fundamental understanding of the game that the ticket holder bargains for. This is a business. The ticket holder is paying vast amounts of money for the right to see this game. He does so because of certain understandings. He's not spending this money to buy a ticket to a rigged event. Nobody would intentionally spend $200 for a ticket knowing one team has stolen playbook signals of the other and therefore has an inherent advantage. WWF has made money over the years. I'm sorry, Your Honor? WWF has made money over the years. Yes. On matches that I think everybody around knows are probably rigged. And they bill that as entertainment. It's worldwide wrestling entertainment and it's billed that way. Let me ask you, and we could give you a whole host of hypotheticals, but you can imagine that from a crooked referee to a system that had run amok in any number of different ways. Where would you draw the line? Where does a line get drawn that would give a ticket holder like yourself and those that you're attempting to represent the ability to bring this kind of action against either a participant or the league as a whole? Well, I think each case would obviously be highly factual, but we're dealing here not with the actions of a player. We're dealing here with the actions of the executive management of the team that bind the team itself, the corporate entity of the team. We're not suggesting that any right of action attaches to a player who misses a field goal attempt or who intentionally interferes with another player, thereby blocking a reception of a pass. That's a part of the game. We're dealing here with the executive management's actions that conceal information that the average ticket holder would want to know. Suppose after halftime, one side decides that we're not going to take the field because the other side is fouling so much. We're not going to take the field for whatever reason. They say, we're not going to take the field, and they don't take the field. They default the team that doesn't take the field. Would the ticket holder have a cause of action under those circumstances when management of the team says, we're going to forfeit it because we don't like the way the other guys are playing? Well, first of all, Your Honor, I've never heard of such a situation happening. The players want their own opportunity to play just to meet their own statistics. So I think it's a far fetch if you may forgive me for saying so. You haven't heard of any situation where someone buying a ticket sued the... There's no case right on point for what we have here either. So I'm giving you a like scenario of where the management of the team says, we're not going to take the field after halftime. Well, that's an interesting question because clearly the teams have a duty to play the game if they've sold tickets to a game. The question is, I think in this case, whether there was a premeditated deception that existed outside of the game. And in fact, here we have a seven-year pattern of this conduct. This is not a matter of a player suddenly losing his grip like Mike Tyson and committing the act he did in his fight. It's a horrendous violation, there's no question about it. It violates the fundamental understanding the ticket holder has. Now vast sums change hands. Why would someone do that knowing it's a rigged game? Certainly they'd pay less knowing it's a rigged game. Now professional wrestling I think is the best example we could use to contraindicate this problem. That's billed as entertainment. But what's fundamental, and they're going to show the ticket which says this game is played under the NFL, the understanding of the ticket holder, the fan if you would be, is that there is a regulated game with certain minimal regulations. So it's not entertainment like worldwide wrestling. This is an assumption, this is an assumed mutual playing field that both parties respect. I guarantee when you buy the ticket that it's going to be a game which can be played according to the rules though. No, this is not a matter of ruled game day rule violations on the field. We're talking about a premeditated attempt to deceive. I'll give an example that I like. Imagine if the Philadelphia Academy of Music books Pavarotti. He's dead, but imagine Pavarotti's there singing. What is the understanding of the ticket holder? That they're going to hear a Pavarotti concert live and the natural voice of Pavarotti. Suppose unbeknownst to the Academy, Pavarotti and his managers decide he will lip-sync that day to save his voice. He will what? Lip-sync. And his voice is broadcast on the sound system. He pretends to be singing. The next day the ticket holder finds this out. We're going to put an additional five minutes on Mr. Atherton's time. Thank you, Your Honor. And the other side will get five additional minutes. Thank you. If the next day the ticket holder learns Pavarotti was lip-syncing, it's disclosed in the press, is there a fraud? Now, they saw Pavarotti. But doesn't that case exist? I mean, that fact pattern exists in the world of rock concerts and lip-syncing. Yes, but in the world of opera singing, and it's my example, there's a fundamental understanding the one here is the live natural voice. But a ticket is a ticket. I mean, and we haven't yet asked you about the difference between is the ticket a contract or a license? And that's where a lot of the case law is. Well, I think I should take the invitation to go right there now. I think the distinction is the type of event. Because clearly a rock concert is not an opera event. And there are fundamental understandings that may differ between the two classes of ticket purchases. With an NFL ticket, one is buying a ticket for an event that is represented to be under the auspices of the NFL. And that's playing on the ticket. It's awesome. You know, two years ago, I bought a ticket to see a New York theater production. I won't state who or where. And the person I specifically wanted to see, I wanted to see the production, was substituted for an understudy at the last minute. Did I have a cause of action to get my ticket money? I paid a lot of money for that ticket. You would not, unless the ticket promoter knew in advance. It was advertised that this was the cast. But is there a, I mean, maybe there's a... I can address that. Yeah, please do. Again. An understudy is a normal risk of a theater performance. When you buy a ticket, you know there may be people substituted in. But supposing the promoter knew in advance that the star was in detox in Texas, and for three months could not appear in that play, yet continues to run advertisements with that star's name, inducing people to buy those tickets, who then show up and find there's an understudy. There we have fraud outside of the performance, and that's analogous to this case, a premeditated pattern of intentional deception by omission of the facts known to the participant. So I would say, Your Honor, the answer is yes, there's a cause of action under those circumstances. You know, the question is, is this a license or a ticket? In the Houston case, the New Jersey courts, and we're governed by New Jersey law, have departed from that dictum that was in Schubert that says, well, you only get a license to see the event. The court has said that's not valid any longer. In fact, Schubert never even went that far. Schubert said he has a right to a refund for his ticket. And so, and the grovelment of the damages here are essentially a refund. There might be other special damages that could be put there. Aren't you suggesting that the nature of a ticket changes with the nature of the event? I mean, is that possible to actually have that kind of a rule? It happens all the time in any contract. The nature of the contract is predicated on the understanding of the parties. But in terms of entertainment? Entertainment's a business. I think we need to move from the notion of saying fraud cannot lie in the entertainment context. If Pavarotti's managers, in my hypothetical, knew in advance that he'd be lip syncing, and nevertheless sold tickets to the public, and the opera goer's understanding, as the court, as a trier of fact determines, is that he's going to be singing live, then I think we have an element of fraud in the dance. So you would say it's perfectly reasonable to have a rule in the Third Circuit that a ticket to a rock concert means it has a different set of legal rights than a ticket to an opera? No, of course not. It depends, though, on the factual premise of the case as it's developed in the trial court. When one makes an allegation that Pavarotti should have been singing live, and that's the fundamental universal understanding of the opera goer, that's a fact finding that the trial court will make. When Madonna sings, it may well be understood by everyone that she's going to be lip syncing. Or it may not be a material factor. They may be going simply to see the spectacle of Madonna. I'm dating myself. Madonna's not that current anymore. But the fact remains it's a factual, specific question. Well, in order to get yourself out of a third-party beneficiary mode here, you have no contract with the Patriots or the Jets, do you? I mean, there's no... Well, with the Jets. With the Jets. You have a contract. Yeah. Mr. Mayer and the class did buy tickets from the Jets. Not from the venue owners. So it's not a Bowers case. Yes. I mean... Okay. The venue owner would be the New York Giants. They happen to own the stadium. Uh-huh. So there's a direct contract with the Jets. So the question is, we have the ticket holder where I am. We have the Jets here. And we have the Patriots here. Mr. Affran, how does... I talked about examples. How does Spygate, as this was dubbed by the media, how does this differ from what has been a long-term practice, as it's been alleged in baseball, that people steal signs? And they steal signs, not individually, but teams such as, say, the Yankees, through their home, through somebody in some pre-designed location, steals a sign, flashes what the pitch is going to be to somebody on the bench who flashes it to the batter. So he has an advantage to know whether or not it's a curveball, fastball, slider, whatever coming out of the pitcher's hand. How does that differ? The answer is very simple. That the ability of a player on the field to see signs and match those signs is something he or she is permitted to do. No, not the player. This was a systematic, and it happens in baseball. Somebody tips off a coach in the dugout. The coach in the dugout motions to the player, and the batter therefore knows what pitch is coming. Allegedly, that happens. I don't see any difference between that and Spygate, except they had cameras. Oh, there's a vast difference. The NFL has a specific rule prohibiting the videotaping of signals, precisely because one can then catalog those symbols for weeks and months afterwards, study those signals, and cross-reference them. This is something, Your Honor, that one cannot do on the field through verbal or visual observation, rather. With those rules in place, didn't the NFL take what they deemed to be appropriate action against Coach Belichick and the Patriots? They fined them. They took draft choices away. They told them not to do it again. I think Your Honor's question goes to the question whether the ticket holder has waived any other rights. If you look at the board they'll present, there's only one waiver on that ticket, and that's the waiver of claims against the NFL for torts arising out of body searches at the stadium. That's the only waiver. Now, New Jersey law, and we can brief this supplementarily if necessary, requires express waiver of any cause of action by a party. There's nothing in that ticket that waives any other claim, except that tort claim, for body search violations. And so if the NFL intended, or if the Jets and the Patriots through the franchise system intended any other waiver, they're expected to give notice in that ticket. That was not done. Now, they want to have it both ways. They want to be free to be free of the remedy and never have gone on record and advised people of the loss of rights. That's why this case is significant, that there has to be some minimal bedrock law that governs this vast economic enterprise. The NFL is a multi-billion dollar industry. The average family will spend thousands of dollars for season tickets. This is not mere entertainment going to a movie for $9. We're talking about a major investment by the ticket holder. And that ticket holder has fundamental understandings, and nothing in that ticket waives the traditional remedies where fraud is premeditated outside of that game. Okay. Mr. Rafferty, we'll hear Mr. Mayer on rebuttal. We thank you for your argument, and we'll hear from the other side. Thank you very much, Your Honor. Mr. Goldfein. Thank you, Your Honors. My name is Shep Goldfein. I represent the National Football League. I'm going to spend my time addressing Judge Brown's decision that said there was no legal cognizable injury suffered by the plaintiffs here, regardless of the nature of any of the claims that they have pled in the complaint. Mr. Goldberg, representing the Patriots, and Mr. Belichick will argue with regard to the specific elements of each of the claims raised and whether they state a cause of action. Let me first say, Your Honors, that counsel is very much wrong to suggest this is not an on-field violation. The taping occurred on the field. Referee could have called an unsportsmanlike conduct. That would not have precluded the commissioner and the league office from disciplining the team and the coach for these violations. There's not exclusive jurisdiction over the field versus over the house. How would they discipline a player or the team if they found out these were being videotaped? Well, it happens all the time that a player can be disciplined for an on-field violation. He's called for pass interference or for roughing the passer. Yeah, but there are specific penalties for, you know, offside, roughing up. Yes. Unnecessary roughness. But I've never heard of an offense of videotaping. There are discretionary penalties that the referees possess. The players are not videotaping, and the complaint alleges the videotaping occurred over a period of a number of years, thus at least arguably making this different than, is it Bowers and Castillo, those two cases? Well, Your Honor, I don't respectfully think it makes it different because each of these events occurred at a particular game as a relation to the complaint. At Jets-Patriots games. And to the extent that they each occurred when they were admitted to the game as a fan pursuant to the ticket, the back of the ticket basically says you're admitted only to the stadium for the specified event and for the purpose of having a spectator seat. But they thought they were going to see a legitimate game. They didn't think they were going to see a game that was rigged. Well, they didn't see a game that was rigged. They saw a legitimate game. They saw an NFL. Well, the way the other team signals is a big difference. I play football quite a bit. I play baseball primarily. And we try to figure out signals of the pitcher or the catcher. That's correct. Of course, we didn't videotape. It was all on field. And that's a big difference if you know when someone's going to throw a certain type of picture. Your Honor, in football, it happens all the time that teams are reading each other's signals. They're studying signals. You're allowed to read the other guy's signal. You're not allowed to videotape it. Well, actually, they do videotape under rules that allow for videotaping from an enclosure. They do videotape sidelines. They do have the ability of having, if you will, market intelligence in terms of knowing what the other team's calls are. And they do have the ability to collect this kind of information. The way they did it was much more efficient. Yes. And they got a lot more information. It was. And anyone that's competed knows that if you know the signals of whatever the sport it is, I'm talking about baseball primarily, there's a big difference in knowing what's coming across the base. It was a violation of NFL rules the commissioner so held and the commissioner imposed very, very draconian fines. But at the time the game was played. The most he can do, actually, under league rules. At the time the game was played, it wasn't known at the time. It might have been something he found out after a particular game. And it seems to be strange that someone that goes to a game under a thought that they're going to see a type of game comes away from seeing a game that's not the game they thought they were seeing. Your Honor, maybe I can put it this way. Every fan that goes to a game has the expectation that there will be rules and fractions. And there are certain rules and fractions of a certain nature that can give a team a competitive advantage that makes it, in their words, a quote dishonest game or not a fair competition. Let me give you an example or two. Pass interference on the field is intentionally engaged in many instances by the defense in order to prevent a touchdown from being scored. Off the field, tampering, that is trying to hire a player away from a team at an earlier year in order to get a competitive advantage for the future is a penalty off the field. Violations of the salary cap under the collective bargaining agreement where a team tries to get an advantage in securing the services of a player. Are you somehow channeling Captain Renault from Casablanca? No. You're saying we're shocked? No. I'm not saying, I'm saying we're not shocked and neither are the fans shocked that these things. Neither was the character in the movie. I understand, but it doesn't state a claim, Your Honor. The question is does it state a legally cognizable claim? As the court in Bowers noted, as Judge Brown noted, the fan can walk with his feet. He can basically make the decision that this is not the product that he wants to see. Is the NFL happy or satisfied, maybe satisfied is better, to equate football games in the 21st century with WWF? No, not at all because it is precisely to protect the integrity of the game, the competitiveness of the game, that the penalties were assessed by the commissioner. And in fact, Your Honor, the point here is these are subjective expectations. That's the point of a legally cognizable injury decision in the court below and in the other decisions like Castillo. Castillo is no different than this case, I would submit, because there were rules in boxing that basically said if you bite the ear of your opponent, the referee can disqualify you. We have rules here. If you videotape the sideline, as was done here, you can be penalized. How is the league to operate if these are so-called objectively known violations? Was this the stiffest penalty ever handed down by the NFL? Yes, for this. It's the $500,000 fine under league rules is the maximum that can be assessed against an individual. So this was egregious conduct. It was. There's no question about it. And giving up a first-round draft choice is serious business. It's serious, but that was a penalty to the Patriots. But why shouldn't the Jets ticket holders? The Jets, bitter rivals in the division. Because rules and fractions. They play twice a year, and as was reported from some of the players and I think from Coach Mangini, he always wondered how Belichick had seemed to know what he was doing even before they did it. I mean, why shouldn't the ticket holders do this on recourse? Because rules and fractions are part of the game also. In whatever form they take, and when they are uncovered, the league disciplines and exercises its jurisdiction. And the reason it will become unmanageable, because as noted by Bowers, as noted by Castillo, as noted by the court below, there will be one case after another where there's a disappointed fan who is simply going to say, I've got a lawsuit. Would you make the same argument if one of the teams took money to throw the game? No, I wouldn't make the same argument. You would make a distinction between them throwing the game? I would make a distinction because, Your Honor, the cases in which the rights of causes of action have been upheld are... You put additional time on the clock for... are very different. And I would suggest that that might fall in the category of those cases that have been promoted. What's the difference between this and that? In one case, the team took money to throw the case. In our situation here, a team stole the ability of their... able to play a fair game because their opposition knew the signals that were going to be called. Your Honor, I think it's qualitatively very different. First of all, in this particular game, the videotaping was caught before the end of the first quarter, and it stopped. So it did not have an impact on that particular game. The claim goes back for the... The claim goes back to others, and there's no... I really beg to differ that there's a qualitative difference between a sustained program of fixing games by the exchange of money. Those are criminal actions under the criminal law. This is not a... This is an internal rule of the National Football League. Cases like Flood versus Kuhn, Harding versus the United States Skating Association... Well, let me put that back to the consumer, though. The consumer went there to see a fair game, and in one instance where the... one team took money to throw the game, he's not seeing a fair game because one side wasn't... he didn't see a fair competition. The others, he didn't see a fair competition because one side knew every signal and was able to foretell what plays were going to be called. But there's a... I would submit there's a fundamental difference. The difference is the certainty of outcome. There's no certainty of outcome by taking the signals of... There is certainty of outcome when you're exchanging money. There is no certainty of outcome in this kind, and certainly Coach Belichick put on a defense when the commissioner was trying to assess the penalty. You know, it was his view that he had the right to use... videotape the signals as long as he did not use them in those games. And that the rest of it was no different than studying the films and the plays or interviewing players and understanding the normal... doing what I'll call the normal competitive intelligence that goes into the game. How do you respond to Appellant's citation to Oshinsky? Oshinsky is not on point, Your Honor, because Oshinsky, just like every other season ticket holder case, has the right to renew, the right to first refusal, the right to have an option. Those cases the courts have recognized are separate bundles of legal rights that are possessed by a fan, a season ticket holder, as opposed to what goes on the field of play and their dissatisfaction with the quality of the game that they have seen. But isn't the underpinning of Oshinsky the fact that they recognize that there was a contractual right? Well, they did, but it's a different... I believe the court would rule that the contractual right there is different than the right that you get on admission to the stadium. There are two fundamental different rights. One is the right to buy your season ticket. I'm sorry? Okay, you're explaining my... Yeah. You're answering my question. The right to buy your season ticket package versus the right of entry, the rights you have upon entry to the stadium and to that specific game, which is to have a, quote, spectator seat. And as Judge Brown said, they got what they paid for. Now, you can be upset about, as the commissioner was, with regard to what occurred, but that doesn't mean it's a legally cognizable injury, which is what Judge Brown ruled. Do you think that they would have paid that type of money if they had known in advance that one team knew the signals of the other team and they weren't going to see a game that they thought they were paying for? Your Honor, I think you'll disagree with my answer, but given what I know about professional sports and the 30 years I've been practicing it, yes. I think they would have bought their season ticket packages and I think had they... First of all, had it been known, it wouldn't have happened. But assuming... Well, it's the same people that would have gone to the Coliseum to see the Lions. You know, I mean, people, you know, the WWE is a very strong competitor, actually, within the sports market for the NFL. I mean, the idea that you can separate these kinds of events into one bucket versus another in the concert area that counsel referred to, I would simply take the time to refer you to... We cited it in our brief, I believe. There's a UCLA Entertainment Law Review article, which is at 13 UCLA Entertainment Law Review at 33, which discusses the rights of attendees at concerts. Would you agree that if this is a contract, then there's a fact question about breach? No, I'd still be... And the point and the reason that I don't, Your Honour, is because of what Judge Brown said. He said, regardless of whether this is a license or a contract, this is not legally cognizable injury as a matter of law. That's the issue that he decided. Counsel really is not addressing that issue. He hasn't addressed, really, the question of why is it legally cognizable injury at law? And all of the cases have said, no, it isn't. Why don't we hear from Mr Goldberg on those various counts? That's what he's going to discuss. Thank you very much, Your Honour. In police court, my name is Daniel Goldberg. I represent Coach Belichick and the New England Patriots. I wanted to start briefly by referring to the rule that's been discussed so far here today because I think that it's important to recognize that this is not a society law. This is not a statutory law. Is this chart in the record? It is, Your Honour. It's part of the Supplemental Record Appendix. It was before the court below. Yes, it is. And I'll come to that in just a moment. The rule that is at issue is an NFL-created rule, interpreted rule, unenforced rule. It says that there is no videotaping from the sidelines or other areas except for areas that are totally enclosed, which are not accessible during a game to staff members. The NFL does not prohibit scouting in advance of teams. It does not prohibit using binoculars to assess what the opposing coaches are calling. It does not access... It is not outlaw dictating your own observations. It does not require that you not meld those dictations with the game films that have to be created at every game. Where the NFL decided to draw the line was at the videotaping from the sidelines. What Coach Belichick understood that rule to mean was that you're not to use those videotapes in the game in question. And there is no allegation in this case that the Patriots ever used the videotape for the game in question. In fact, the allegations are very clear. They used it for the next game. That's right. And that's exactly because all teams scout other teams, because coaches change teams, players change teams with knowledge of the playbooks. Forget about signal calling. That's why every team for every game and every season works on changing their signals. It's why when you watch a game, because they know there are lip-readers out there, the coaches are always talking in to their play card, because this is known. So now the NFL... That's the way your client does it. Not all the coaches talk that way. Well, from my observation on television, I've seen a lot of coaches do that. There's no question about it. But my point is this. My point is this, is that this was an NFL-created rule. Now, the NFL said to Coach Belichick, you're wrong. It doesn't matter when you use the video, and even though you say you're not going to use it and there's no evidence that they ever used it in the game in question, the NFL said, your interpretation is wrong, our interpretation is right, it's our rule, and we're fining you, and we're fining the team. That is the context for this line drawing. This is... Judge Cowen, this is not a question of somebody violating the criminal law or society's law and exposing themselves to criminal activity. This is a question of the line drawing by the NFL and whether a fan coming to a game has a right to expect that a game will be free of either on-field or off-field infractions. This rule, actually, is an interesting combination between the two. The rule itself prohibits on-field game day videotaping the way that then, for the Patriots, these films were used, was not during a game. So it's kind of an interesting mix, but I submit that it doesn't matter for purposes of the legal analysis because, as Mr. Goldfein pointed out, there are lots of off-field activities which get punished and which can impact the competitive balance. He mentioned a few. Tampering with players. There is no requirement in the NFL that you disclose as a team that a player you've hired, in fact, you had communications with during the previous season. If you're caught for tampering, you pay a fine. It may include money. It may include loss of draft picks. The same thing is true with salary cap violations. A team may have violated the salary cap and not have to disclose to fans, let alone fans of the adversary, well, we've violated the salary cap. The same thing is true with on-field intentional infractions of those NFL-created rules. You don't have to advise the fans, the Jets fans, in advance of the game that we're going to intentionally try to draw you offside. We're going to intentionally commit pass interference if we think that you're going to go for a touchdown on a long play. There's no requirement of that. And if any team does that, whether it's the Steelers or the Patriots or the Jets, there is no cause of action that's created as a result. So what is it that is alleged here? What's alleged here is that Mr. Mayer, a season ticket holder, so he bought his tickets for the entire season. He attends the first game of the 2007 season and sometime during the first quarter, the Patriots are determined by NFL personnel to have a videographer on the field. He is removed from the field and afterwards, the Patriots are assessed the penalty. Now, the question was posed about contract versus license, so let's pause for a moment and see what's really at issue in this case. Because in contrast to Oshinsky, which dealt with the, I think, rather narrow question of whether season ticket holders have a contractual, or at least may, have a contractual right of renewal. What the plaintiff here complains about is his use of a particular ticket to a particular game. He's not saying that he lost his season tickets or he didn't get the right to renew. What did that ticket to that particular game say? It said what's right here on this board, which is part of the record appendix. The first thing that it says is what rights do you have as a ticket holder? And right at the outset, what it says is that the ticket only grants entry into the stadium and a spectator seat for the specified NFL game. That's what he gets. So, pause for a moment because frankly for purposes of this case, whether this is a revocable license and indeed it has all the language and indicia of a revocable license or whether it's a contract, there is no contractual provision here saying you get to see an infraction-free game. There's nothing in the ticket that says you have no cause of action if you see a game that's rigged because one side knows the signal is thrown by the other side. You don't, Your Honor, with respect to that question and Mr. Afrin's argument, you don't need to have a waiver of rights where there are no rights. Well, yeah, but he's claiming it's part of his contract in itself. He doesn't have to have that specifically in the agreement that is part of his inalienable right of a contractor under whatever code it comes under, contracting, not the Uniform Commercial Code, whatever, that he had a right to see a game that wasn't one-sided, rigged because one side knew the signals of the other side. And so the fact that you have this disclaimer here didn't really address what his cause of action is claiming, whether it spells correctly or not. Well, actually, He says this is implied in the nature of the contract. New Jersey, this ticket and this question would be a matter of New Jersey laws to whether you can imply that term in the contract and as we cited in our main brief, New Jersey law is very clear in terms of when the very limited circumstances in which you can imply a provision. Well, New Jersey implies a lot in contracts. I want to tell you especially in consumer contracts, tenant they're very quick to apply certain basic rights in contracts that don't have to be spelled out in the agreement. Good faith are one but main one is good faith contracting between the parties. Well, as I say, one starts with the principle about whether this is a contract at all and as I say, even Oshinsky, even Oshinsky because Oshinsky refers back and cites with approval just distinguishes yard metal which was actually my case in Massachusetts and yard metal along with many other cases going back to the Schubert case in New Jersey which was not overruled by the Oshinsky case is very clear. Tickets to entertainment events are revocable licenses and that's consistent also with the language. What about the count and the allegation of common law fraud? It's not in contract. Right. You don't need to have privity to be able to recover if you can approve common law fraud. Right. Hasn't that been adequately pled? No it hasn't Your Honor because number one of course if there were affirmative statements of fraud they would have to have been pled with particularity pursuant to 90. There are no claims of affirmative misstatements. What the assertion is is that there was a failure to disclose in advance. Now under common law fraud rules for an omission of information to constitute common law fraud there either has to be a special relationship like a fiduciary duty between the parties. Clearly not in this case. A relationship between the New York Jets the NFL and their ticket holder. I represent the Patriots and Bill Belichick who have been sued in this case. Your Honor we have no duty whatsoever to the fans of the New York Jets. You have a contract however through the NFL to play the Jets twice a year. Yes that's part of the league rules that we have established or between the NFL which  contractual obligation of teams not to commit infractions. Aren't you left so with the proposition that the tickets give the ticket holder no right to expect an honest gain? I think what is very clear and it does go to the common law fraud issue is there can be no reasonable reliance on some notion that there will be an infraction free gain. Some notion of honesty? Your Honor with all respect to that question it depends it really does depend what is deemed to be honest. Is it honest if you have tampered with another team's player in order to hire that player? Is it honest if a coach you have hired over the summer and there are no rules against this discloses that here's what the playbook of the team that I just came from will be? This happens all the time there are no league rules against it. But the violation here goes to the foundation of the play on the field. If you know the other man's signals him giving the signals is no consequence you're going to be able to anticipate the next play. Anyone that's competed knows that. I agree with you everyone spies on everyone it's done at every level through high school through professional ball. This was done with a lot of ability and a lot of alacrity. And it seems to be fundamentally unfair when you're seeing a game which maybe not rigged but you know you're playing someone who's making you play with one hand tied behind your back because they know everything you're going to run. With all respect to your question your honor I will tell you having been involved in this issue once it came to the fore deeply there were precious little benefits that came from this because teams routinely change their signal calling game to game because teams know they've been scouted in advance. Well my only point is that it is an NFL rule. It is for the NFL to interpret it is for the NFL to punish it is for the teams to take the punishment look Belichick may have disagreed with the interpretation but he paid very dearly for his violation. With great respect to Commissioner Goodell and I do have great respect for him he has seen it as a very important part of his charge as Commissioner to make it very clear he will act with a heavy hand whenever he sees anything. So if the NFL thought this went to the heart of the game? Well what the NFL decided was that it was a serious violation of their rules as they interpreted them and that's fine but that doesn't answer the question as to whether every time the NFL makes that argument if we were to say there is a contract that there still is no cause of action that can be premised on these facts. Twofold. First of all by the way the claim with respect to contract they don't even claim that there was a contract with us so their claim on contract is based on a tortious interference claim. It's a third-party beneficiary but not of their issue. They claim third-party beneficiary of a contract between the Jets and the Patriots and or the NFL and it's not that they created a cause of action that is there is a contractual duty to comply with all NFL rules. Is that implied in contracts for good faith contracting? Absolutely not because when you're playing you draw the line. If the commissioner thinks it's serious then all the Jets fans can sue for $184 million but if the commissioner doesn't think it's so serious they can't. No, this is for the NFL to apply and interpret and it's for the teams and bear in mind as happens every year the NFL looks at its rules and sometimes it changes those rules just as it did in the wake of the   league. Thank you.    questions we will hear the commissioner to answer any questions on this issue. Mr. Goldberg thank you. We will hear from Mr. Mayor on rebuttal. Thank you, Mr.     You heard the commissioner say it's not proper to dispose of it the way the lower court did. We say there's a contract here. According to your adversary it's not apropos. That dealt with a contract right of renewal and so forth. They say that's not involved in the fact pattern here at all. There's no relevance to what's before the court. That's their interpretation. Our interpretation is that the court was suggesting there's a bundle of the actions of the patriots and it's for the fact finder to consider. Let me ask a specific question. In your brief, you rely on the revenue sharing arrangement between the jets and the patriots. The arrangement there is with each home team and away team. Why should we consider that arrangement in evaluating the adequacy of your complaint when you never allege that in the complaint itself? The complaint does allege a revenue sharing arrangement. It does state that there are contracts between the jets and the patriots to share revenue for these games as well as contracts between the jets, the patriots, and the NFL. That fundamentally is in the complaint. There's no question that that is another fact issue that ought to be delved into further in these proceedings. What is the nature? Because that goes to the extent that the patriots benefit from this conduct, this fraud, to that extent it is possible to maintain an action for fraud. How do you establish your common law fraud count? Well, by virtue of the fact that all of these omissions were kept from the ticket holders who purchased these tickets for the games. I mean, the conduct, there's no allegation that the NFL was complicit in this conduct. It's alleged that the conduct was carried out by Coach Belichick, his people, and the New England Patriots. They had no special relationship with the New York Jets season ticket holders. The Patriots? Well, we allege that they do by virtue of the revenue sharing contracts that all NFL teams have, which hasn't been denied by our adversaries in their papers. And that is the impetus for their fraud, we allege. If you have to use the NFL as the conduit through which you get to the Patriots, then why is it not sufficient to rely on the NFL's enforcement mechanism to deal with these kinds of infractions? Right. Well, I'd say, first of all, we're not alleging exclusively an NFL conduit. We're saying there are actual revenue sharing arrangements between and amongst the team, depending on the size of the crowd. My point is that you need that intersection in order to create your argument that there's a relationship of some nature between you as a team  NFL. Well, to the extent where the complaint discusses the NFL, we believe their liability arises once they took possession of the videotapes and then decided to destroy them, therefore further perpetuating the fraud. But I think an example   Jersey consumer fraud statute. We don't concede at all that there isn't a duty that the Patriots has, but the only thing that the New Jersey consumer fraud statute requires is is there to be critical information that any consumer would want to know before purchasing these tickets. And I must say I differ with my adversaries in that worldwide wrestling entertainment is billed as entertainment and makes no claims that the matches are fair or even. And therefore, it's a completely different matter. So under the Consumer Fraud Act, I think the case ought to proceed to discovery to determine the sole question under the Consumer Fraud Act. Now they've posited several other scenarios that the ticket holder might want this information or that information but for purposes of our case, to know that a team could have the other team signal that they were doing 75% of the time. And also we allege in our case that you saw in the complaint there are a number of actions that the Patriots took to conceal what they were doing. They took the light off the top of the roof to keep this videotaping program secret. And all of those things indicate intent to defraud. And they certainly indicate that in contrast to what our adversaries suggested, Coach Belichick and the team were not under the misapprehension that this rule was being adhered to. They were in fact doing something which went to the fundamental fairness of the game and didn't want to be caught doing it. And we think we ought to have an opportunity to prove in court to a fact finder that that is the case. Thank you. I'm sorry that I don't know the record of these various games, but did the Patriots win every game when they used the fruits of this labor? Well, this is a sore subject for long suffering Jets fans, but the Patriots, I don't, we haven't, that's an excellent factual question we'd like to uncover, did they? Their record was, yes, and their record was startlingly different after 2000 when it is alleged in facts elucidated by Senator Spector that this videotaping program began. Prior to that they were as woeful as the Jets. After that they became the best team in football for many years running. For a while. Now you're getting our juices really going. Well, there's an assumption that it had a deleterious effect on the Jets, there's no question about it, and the question is whether or not that has a recognizable cause of action or back to basics, whether you just bought a seat and you hope you saw a fair game. On the seat issue, your honors, I would just urge the court to reexamine the Shubert case cited by our opponent, because in that case, I believe the actual holding of that is that a ticket to a performance is a contract, and it was simply it was the tort that was  that case,  rejection. Well, I think the court now thinks it was a license, but then it went on, and this is where you might think it's confusing, it went on to say that there was a breach of contract type remedy, so there's a little bit in Shubert for everybody. Well, there is, but I would suggest that if you read that in connection with the Ledbetter case, which is what Shubert was based on, and then the subsequent case, which was the Hearst versus the Hearst Theaters case, that case seemed to make clear that was a King's Bench case that was cited in Houston, which is a New Jersey Supreme Court case, that case suggested that tickets are contracts, so there may be some room for reevaluation on this point. It may be, as we suggested in our briefs, that contractual issue could be certified to the New Jersey Supreme Court for them to decide. On the other hand, I think that it's very clear that the consumer fraud claims ought to stand just because it's inconceivable that this conduct wouldn't be material to anyone purchasing a ticket to the stand. Well, in essence, whether you're talking about tort, license, or contract, the question presented in any form is whether when you buy a seat to the stand, you have some sort of guarantee that you're going to see a fair or unfair performance. And it doesn't matter how you frame the contract license or whether or not you have a cause of action if you see a rigged game. The game, as far as I'm concerned, is rigged if I know the other guy's, one guy knows my signals. Correct. And what our adversaries say is, well, it's all a matter for the NFL and the NFL punished the team, but that leaves the ticket holder out in the cold. That means that no consumer of sports, unlike other goods, has a remedy for fraud. Well, that's the only way to  And when he buys that ticket or license, as part of the license or ticket, he's going to see a fair and square game. Right. And the consumers, they're paying the freight, and we've suggested various areas under which they can recover. And they do in other areas of commerce in the nation. We don't see why this is different just because it's sports slash contract. Mr. Mayor, we understand your argument. We thank you and your  an excellent argument as well as counsel from the other side. And we will take this matter under advisement. Thank you, Your Honor. Thank you, Your Honor. Mr.             So please wait a minute. We'll begin shortly. I ask that the members of the committee please take your seats  soon as possible.